UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

AMBER RUCKER, an individual,

    Plaintiff,

v.                                Case No.:   2:21-cv-207-SPC-KCD

GREAT DANE PETROLEUM
CONTRACTORS, INC.,

    Defendant.
_____/

## **OPINION AND ORDER**[1]

Before the Court are Defendant Great Dane Petroleum Contractors, Inc.'s Motions for Summary Judgment (Doc. 61, 62), Plaintiff Amber Rucker's Response in Opposition (Doc. 68), and Great Dane's Reply (Doc. 75). For the following reasons, the Court grants the Motion on Rucker's claims (Doc. 61) but denies the Motion on the counterclaim (Doc. 62).

---

[1] Disclaimer: Papers hyperlinked to CM/ECF may be subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or their services or products, nor does it have any agreements with them. The Court is not responsible for a hyperlink's functionality, and a failed hyperlink does not affect this Order.

## BACKGROUND[2]

This is an employment dispute. Great Dane is a petroleum company. A run-down of the key players is necessary. Steve Nale, Wayne "Curt" Ashley, and others owned Great Dane. Nale was President. Ashley was CFO and Rucker's supervisor until he retired. After Ashley retired, Danielle Watkins—Nale's daughter—took over as CFO. Winsome Scott worked at Great Dane and was Rucker's confidant. She is described by varying people as an office administrator, an office manager, and an administrative manager. She was never Rucker's supervisor.

Rucker worked at Great Dane from 2012 to 2020. She started as Ashley's assistant and then became head of payroll. Rucker's work included reconciling credit card statements and taking care of payroll and benefits. And for much of Rucker's time at Great Dane, she was the only one responsible for payroll. After about eight years at Great Dane, Rucker was suspended and then fired in January 2021.

The parties disagree on why Rucker was suspended and fired. According to Rucker, Great Dane retaliated against her because she complained about Great Dane's many misdeeds and illegal activity: (1) bribing 7-Eleven employees to win contracts; (2) allowing employees to use

---

[2] Because the Court writes for the parties, it assumes familiarity with the facts and writes only those necessary for resolving the parties' motions. Unless otherwise noted, the parties either agree on these facts or they were undisputed in the record.

company credit cards for personal use, then writing them off as business expenses; (3) misrepresenting to its insurance carrier that it was a drug free workplace; (4) fraudulently applying for over 2 million dollars in PPP loans[3]; (5) overcharging customers for fictious expenses; and (6) avoiding payroll taxes by mislabeling wages paid to employees. Rucker says she complained to multiple people about these transgressions for years, including to Ashley, Nale, and Scott. She also submitted a complaint to 7-Eleven in October 2020, which led 7-Eleven to investigate their employees' relationships with Great Dane. 7-Eleven eventually cut ties with Great Dane but at some point after Rucker's suspension and firing.

Great Dane fires back. It says it suspended Rucker in December 2020 because she emailed Great Dane's entire payroll information to managers unauthorized to access it. And then Great Dane says it fired her shortly after when it learned she had been inaccurately paying herself overtime for years.

Here is how Rucker paid herself: she kept two sets of timesheets to track her regular and overtime hours. One set documented up to about 40

---

[3] "PPP loans" are Paycheck Protection Program loans—a "SBA-backed loan that helps businesses keep their workforce employed during the COVID-19 crisis." *Paycheck Protection Program*, U.S. Small Business Administration, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program.

hours a week. The second set noted her alleged overtime hours.[4] Rucker took the excess hours, calculated her overtime pay based on time and a half her normal rate, and inputted the amount as a "per diem" to be paid. It's undisputed Rucker's method was not the correct way to pay overtime. But Rucker says Ashley told her to do it that way. (Doc. 61-2 at 17:1-6; 25:8-13, 34:23-35:4, 36:9-10; Doc. 71-1 at ¶ 7). Great Dane denies that Rucker worked the extra hours and that Ashely (or anyone else) authorized Rucker to pay herself the way she did.[5] (Doc. 61-3 at ¶¶ 9-10, 12; Doc. 61-5 at ¶¶ 9-11, 13).

At some point in 2019 or 2020, Ashley retired, and Watkins took over as CFO and Rucker's supervisor. The parties dispute when the transition happened. Great Dane had a retirement party for Ashley in October 2019. It says Watkins became Rucker's supervisor around then. (Doc. 61-5 at ¶¶ 2, 9; Doc. 71-4 at 11:9-11, 12:3-8). But all agree Ashley was still involved in Great Dane, at least in some capacity, until November 2020, as he signed checks for the company and consulted with Watkins. (Doc. 71-4 at 17:20-18:5, 24:1-20). Rucker claims Ashely still supervised her and approved her overtime

---

[4] The overtime timesheets were handwritten and signed by Ashley. But Rucker admits that Ashley signed a blank timesheet and she copied the form to use weekly for her overtime hours.

[5] Great Dane also accuses Rucker of charging it for work done on Rucker's personal home. Rucker admits Great Dane paid for at least some work on her home, but she asserts that Great Dane approved it and it was part of a scheme to figure out how Great Dane was paying for personal invoices. Finally, Great Dane says Rucker reported taking multiple business trips from her home when she was working remotely to the office when she made no such trips. Rucker admits she didn't take all those trips but argues that is between her and the IRS.

4

timesheets until November 2020. (Doc. 61-2 at 39:20-23). But even Rucker agrees that after November 2020, Ashley was out. *Id*.

In December 2020, Rucker emailed payroll information to multiple managers who otherwise would not have access to the information. (Doc. 61-2 at 124:13-21, 125:6-8; Doc. 71-4 at 14:6-13). Within days, Great Dane suspended Rucker with pay. (Doc. 61-5 at ¶ 12; Doc. 61-7; Doc. 71-4 at 45:14-46:3, 52:25-54:1).

Because of Rucker's suspension, Watkins took over payroll. (Doc. 71-4 at 84:8-20). She soon discovered how Great Dane paid Rucker large per diem payouts for years—essentially doubling her salary—for no apparent reason. (Doc. 61-3 at ¶ 9; Doc. 71-4 at 70:7-10, 84:8-20, 88:13-89:8, 90:5-15). Great Dane's lawyer then asked Rucker to provide evidence or explanation for why she was entitled to those funds. (Doc. 61-2 at 146:6-11; Doc. 61-8). When she failed to do so, Great Dane fired her. (Doc. 61-2 at 30:22-31:19, 146:23-25).

Rucker sues Great Dane under the federal False Claims Act ("FCA") and Florida's Private Whistleblower Act ("FWA"), alleging her suspension and discharge were unlawful retaliation. Great Dane counterclaims, alleging civil theft and violation of the federal Computer Fraud and Abuse Act. Great Dane separately moves for summary judgment on Rucker's retaliation counts and on its civil theft (Count I) counterclaim.

5

## LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." Id. "[A] mere scintilla of evidence" does not create a genuine issue of material fact, so a nonmoving party may not simply say, "the jury might, and legally could, disbelieve the moving party's evidence." Hinson v. Bias, 927 F.3d 1103, 1115-16 (11th Cir. 2019) (internal quotation marks and citation omitted).

For issues the movant must prove, the "movant must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." Landolfi v. City of Melbourne, Fla., 515 F. App'x 832, 834 (11th Cir. 2012) (citation omitted). But for issues the non-movant bears the burden, the movant has two options: (1) point out a lack of evidence to support the nonmoving party's case; or (2) provide "affirmative evidence demonstrating that the nonmoving

6

party will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Green and Tuscaloosa Cntys.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (citation omitted). "The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material facts exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted).

Courts may not make credibility determinations or weigh the evidence when reviewing the record. *See Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010). Courts view evidence and draw all reasonable inferences in the nonmoving party's favor. *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002). But an "inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation." *Id.* at 1324.

## DISCUSSION

### A. Rucker's Retaliation Claims

Great Dane seeks summary judgment on Rucker's two retaliation claims under the FCA and FWA. At first glance, this case seems ill fitted for summary judgment given the vitriol between the parties. But all the parties' sound and fury signify nothing in the end. Once the Court waded through each side's onslaught of relevant and irrelevant information, what remains

7

are certain undisputed facts that entitle Great Dane to judgment as a matter of law on narrow grounds.

Because Rucker brings retaliation claims under both the FCA and FWA, a review of each statute's elements is the starting point. Beginning with federal law, the FCA prohibits retaliation because of an employee's lawful acts "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). To prevail under the FCA, Rucker must show (1) she was engaged in protected conduct and (2) that Great Dane retaliated against her because of that protected conduct. *See Mack v. Augusta-Richmond Cnty., Ga.*, 148 F. App'x 894, 896–97 (11th Cir. 2005). More specifically to the second prong, Rucker must show retaliation was the "but for" cause of her suspension and termination. *See Nesbitt v. Candler Cnty.*, 945 F.3d 1355 (11th Cir. 2020). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

Turning to state law, the FWA protects certain employee actions against violations of law, rule, or regulation, where those actions meet statutory requirements. Fla. Stat. § 448.102(1)-(3). A retaliation claim under the FWA is guided by the same *McDonnell Douglas* analysis as a Title VII claim. *See Berber v. Wells Fargo, NA*, 798 F. App'x 476, 478–79 (11th Cir.

8

2020). Rucker must first establish a prima facie case by demonstrating (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) the two are causally related. *See id.* Great Dane must then offer a legitimate reason for the adverse action. *See id.* If Great Dane does, Rucker must then prove the proffered reason is "mere pretext" for prohibited, retaliatory conduct. *Id.* Like the FCA claim, Rucker must prove the desire to retaliate was the "but for" cause of her suspension and firing. *Chaudhry v. Adventist Health Sys. Sunbelt, Inc.*, 305 So. 3d 809, 817 (Fla. Dist. Ct. App. 2020); *Butterworth v. Lab'y Corp. of Am. Holdings*, 581 F. App'x 813, 818 (11th Cir. 2014).

For purposes of summary judgment, the Court assumes, without deciding, that Rucker engaged in protected activity to trigger protection under the FCA and FWA. Great Dane presents reasons for Rucker's suspension and firing, which is all the Court needs at this stage. Specifically, Great Dane says it suspended Rucker for emailing its entire employee payroll information to managers unauthorized to access it and fired her for stealing money through her per diem/overtime pay scheme. (Doc. 61-2 at 16:10-25; 124:13-21, 125:6-8; Doc. 61-7; Doc. 61-5 at ¶¶ 12-14; Doc. 71-3 at 64:21-65:6; Doc. 71-4 at 14:6-13, 45:14-46:3, 52:25-54:1, 66:3-10). The Court thus focuses its analysis on the but-for causation element common to both the FCA and

9

FWA.[6] This means that Rucker must prove (by a preponderance of the evidence) that Great Dane's reasons for suspending and firing her are pretext for the prohibited retaliatory conduct and retaliation is the but-for cause of the suspension and firing. *See Castillo v. Roche Lab'ys, Inc.*, 467 F. App'x 859, 862 (11th Cir. 2012) (stating because the plaintiff must ultimately prove retaliation, "[s]he must produce significant probative evidence of pretext." (cleaned up)). She cannot do so, and here's why.

First, Rucker admits she sent out the employee payroll information, which is why Great Dane suspended her. The Court could end there on the suspension, but Rucker tries to sidestep her admission and create disputed facts through her affidavit in response to summary judgment. (Doc. 71-1 at ¶ 11). There, she expands on why she emailed the salary information:

> I sent an email that included salary information to management-level employees only, but I did so as part of my efforts to stop suspected PPP fraud. As seen in that email, after the Defendant received the PPP money, Ms. Watkins (the daughter of Mr. Nale) suddenly received a $60,000 raise to the tune of $200,000 per year – way more than the salaries of others similarly situated. My concern was that the Defendant was misusing PPP money by paying an impermissible windfall to Watkins, in violation of the permissible uses for PPP monies.

---

[6] For the FWA claim, the Court assumes, without deciding that Rucker meets her prima facie burden, and that Great Dane has articulated legitimate, nonretaliatory reasons for suspending and firing her. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) ("It matters not whether [plaintiff] has made out a prima facie case if she cannot create a genuine issue of material fact as to whether [defendant's] proffered reasons for firing her are pretext masking discrimination.").

10

(Doc. 68-1 at 5). Even accepting as true the new explanation, her words are empty. It is unclear how the email furthered her goal to stop PPP fraud. And Rucker puts forth no evidence that Great Dane knew the email was sent as part of an attempt to stop PPP fraud. Rucker never says, or presents evidence, that her email expressed concern about PPP fraud.[7] She likely cannot. As Rucker said in her deposition, fairness was the reason for the email: "A dollar, a raise for someone who's working their behind off to bring this company together, yeah, they need to be recognized more. It wasn't fair for the employees. Acting as human resources, it was not fair." (Doc. 61-2 at 127:23-128:8). And when asked if the email was "reporting a fraud upon the federal government," Rucker responded, "The salaries didn't have anything to do with the fraud." (Doc. 61-2 at 128:24-129:5). At bottom, Rucker has nothing to rebut Great Dane's reason for suspending her.

Second, Rucker argues she complained to Ashley, Nale, and Scott for years about Great Dane's illegal misuse of company money (e.g., paying employees' personal expenses, bribing other companies' employees for contracts, and applying for an unnecessary PPP loan). She cites numerous phone calls with Ashley, an email she sent in 2017, another email to Nale in April 2020, and text messages with Scott to show her pattern of complaints.

---

[7] Further, Rucker has not even provided the Court with the email. No party attaches the hotly contested email for the Court to consider. And if Rucker wishes to say the email is protected because it was part of her efforts to stop suspected PPP fraud, she could and should have.

(Doc. 61-2 at 47:12-48:9, 48:19-25, 139:18-25, 141:25-142:9-143:2; Doc. 61-12; Doc. 68-3; Doc. 68-10; Doc. 71-2 at 78:24-80:22, 100:5-11; Doc. 71-3 at 48:18-49:17). But Rucker has no evidence her complaints led to—let alone were the but-for cause of—her suspension or firing. In fact, the evidence speaks to the contrary—she voiced dissatisfaction with company practices for years and remained at Great Dane.

Rucker's best pretext evidence lies with her complaint to 7-Eleven, but even that falls short. It is undisputed that 7-Eleven was an important client who gave millions of dollars in business to Great Dane. (Doc. 71-2 at 30:22-31:3; Doc. 71-3 at 70:10-18; Doc. 71-4 at 38:10-21). And in October 2020, Rucker told 7-Eleven that Great Dane was improperly bribing 7-Eleven employees. (Doc. 61-2 at 68:11-21; Doc. 68-13; Doc. 68-16). 7-Eleven launched an investigation, which Great Dane learned of around November 2020. (Doc. 68-16; Doc. 68-17; Doc. 68-18). About a month later, Great Dane suspended and fired Rucker. According to Rucker, the closeness between her 7-Eleven complaint and suspension/firing shows retaliation was the real reason Great Dane acted against her. But the argument is a nonstarter.

Rucker has no evidence anyone involved in her suspension and firing knew she sparked 7-Eleven's investigation. Rucker says Scott is the only person at Great Dane who she told about being the 7-Eleven source. (Doc. 61-2 at 66:15-67:16). Rucker texted Scott in November 2020, "Please don't

12

say I've been in contact with . . . chief corporate compliance officer." (Doc. 68-10 at Pg. 4-5). 7-Eleven isn't explicitly mentioned but the text is a few weeks after Rucker submitted her complaint to 7-Eleven. Scott responds, "To whom no one talks to me. They even refused to tell me about rich and Denise." (Doc. 68-10 at Pg. 4-5).

Rucker admits Scott's position at Great Dane at that time of her 7-Eleven complaint was office manager and Scott was not Rucker's boss. (Doc. 61-2 at 66:15-67:7). Scott wasn't involved in Rucker's firing. (Doc. 71-4 at 47:9-48:21). So, even if Scott knew Rucker was the 7-Eleven source, her knowledge is not imputed onto Great Dane. *See, e.g.*, *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 Fed. App'x 785, 792 (11th Cir. 2015) (holding plaintiff's FCA retaliation claim failed on causation because he did not present any evidence that the decision makers in his discharge knew he had talked about potential false claims with another employee and where that employee had no role in employment decisions). And Rucker has no evidence Scott told anyone else at Great Dane. In fact, Rucker admits Scott told her she didn't tell anyone else. (Doc. 61-2 at 66:15-67:16).

Also, Watkins, Ashley, and Nale all say they did not learn of Rucker being the 7-Eleven source until after Rucker sued here. (Doc. 71-2 at 81:10-82:10, 89:18-91:6; Doc. 71-3 at 54:4-6, 61:17-62:5, 65:14-20, 68:12-17; Doc. 71-4 at 37:16-20). To the extent Rucker may have told Ashley that she was

13

*considering* telling 7-Eleven about Great Dane, that doesn't hold water because she offers no timeline for when she supposedly said so and she complained to Ashley about 7-Eleven for years before with no repercussions. (Doc. 61-2 at 46:3-48:4, 48:12-49:11; Doc. 71-2 at 83:6-84:14). What's more, Ashley was not involved in Rucker's firing. (Doc. 71-2 at 157:8-10).

To the extent Rucker relies on Nale's emails to 7-Eleven on November 16, 2020, and December 15, 2020, this fails because there's nothing in either to suggest Nale knew Rucker was the source for the investigation. (Doc. 68-17; Doc. 68-18). What's more, Rucker admits that her complaint wasn't the only reason Great Dane lost its business with 7-Eleven. (Doc. 61-2 at 154:18-155:11).

Third, Great Dane says it fired Rucker because of her per diem/overtime scheme that amounts to civil theft. It is undisputed that Rucker paid herself overtime through per diem payments. It is also undisputed that Rucker was the one putting these payments in the payroll system as per diem and she didn't put any other employees' overtime in that way—she listed all other employees' overtime hours under the correct category of overtime. (Doc. 61-2 at 75:22-76:2-10).

It is disputed, however, why Rucker paid herself this way. Rucker says Ashley told her to classify her overtime as per diem to hide her overall salary from Great Dane "partners and the other east coast employees" and approved

14

her pay for years. (Doc. 61-2 at 17:1-6, 24:15-20, 73:11-16 ("Curt Ashley did not want the other coast to know what I worked and what I paid. It was his sandbox. No one else was allowed in payroll or in the books.")). But here it does not matter why Rucker used the per diem scheme because it is undisputed that, when Great Dane fires Rucker in January 2021, Ashley was no longer at Great Dane and Watkins had taken over as CFO. This is important because Rucker has no evidence that anyone at Great Dane beside Ashley knew about her overtime/per diem practice. In fact, Rucker's evidence speaks to the opposite—Ashley wanted to hide her overtime from others at Great Dane. So, even if Rucker wasn't stealing Great Dane's money and really worked those overtime hours, when Watkins took over payroll, she didn't know that. Watkins discovered Rucker had large sums paid to her inappropriately, no one left at Great Dane knew why, Ashley tells Watkins he didn't approve them,[8] and Great Dane asked Rucker for an explanation. She didn't provide one.

At bottom: Rucker has not adduced enough evidence to show Great Dane's legitimate reasons for suspending and firing her were pretext and that retaliation was the but-for cause of her discharge. It's clear Great Dane

---

[8] Viewing the evidence in the light most favorable to Rucker Ashley is lying—he approved Rucker's payments and told her to put them as per diem. But it doesn't matter because Rucker makes no allegations, and has no evidence, that anyone else at Great Dane knew this. In fact, she admits the opposite—Ashley purposefully hid the amount of overtime she worked from others.

15

had reason to suspend and fire Rucker beyond any retaliatory motive. Consequently, the Court grants Great Dane's motion for summary judgment and dismisses Rucker's FCA and FWA retaliation claims.

**B.   Civil Theft**

Great Dane also seeks summary judgment on its civil theft counterclaim. For a civil theft under Florida law, Great Dane must show by clear and convincing evidence an injury caused by Rucker's violation of Florida's criminal theft statute, Fla. Stat. § 812.014. *See Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1326–27 (11th Cir. 2006); *see also* Fla. Stat. § 772.11 (providing civil remedy for theft). Specifically, Great Dane must show Rucker (1) knowingly (2) obtained or used, or tried to obtain or use, Great Dane's property with (3) felonious intent (4) either temporarily or permanently to (a) deprive Great Dane of its right to or a benefit from the property or (b) appropriate the property to Great Dane's own use or to the use of any person not entitled to the property. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009). The felonious intent requirement exists because theft is a specific intent crime—actual knowledge on a defendant's part is necessary. *Almeida*, 456 F.3d at 1327.

The Court cannot determine whether Rucker knowingly deprived Great Dane of its property with the required felonious intent to decide civil theft as a matter of law. Rucker maintains Ashley approved her overtime and she

16

really worked those hours. (Doc. 62-2 at 17:1-6, 25:21-26:6). If this is true, she was entitled to compensation for that time, meaning she did not deprive Great Dane of its property—she just incorrectly inputted it as per diem, for which she could face tax consequences. Rucker also says the work on her home was approved by Great Dane. (Doc. 61-2 at 105:1-109:2; Doc. 62-8; Doc. 71-9). The Court is required to read the evidence in the light most favorable to Rucker. So, if Rucker really worked that overtime and it was approved by Ashley and Great Dane approved the work on her home, Great Dane can't show civil theft. Just because Great Dane had reasons to fire Rucker, doesn't mean her conduct amounts to civil theft.

Because Great Dane's civil theft survives, the Court questions the propriety of trying the civil theft counterclaim given the parallel, pending criminal case against Rucker. (Doc. 62-6). And Great Dane's second counterclaim is still stayed pending bankruptcy proceedings. (Doc. 42; Doc. 43). So the Court will schedule an in-person status conference to discuss how Great Dane's counterclaims will proceed.

Accordingly, it is now

**ORDERED:**

1. Defendant Great Dane Petroleum Contractors, Inc.'s Motion for Summary Judgment on Plaintiff Amber Rucker's claims (Doc. 61) is **GRANTED**.

    a. Counts I and II of the Amended Complaint (Doc. 28) are **dismissed with prejudice**.

    b. The Clerk is **DIRECTED** to enter judgment.

2. Defendant Great Dane's Motion for Summary Judgment as to Count I of its Counterclaims (Doc. 62) is **DENIED**.

3. The parties must attend an in-person status conference before the undersigned on **April 6, 2023, at 10:00 a.m.**

    a. The parties must come prepared to discuss the status of the counterclaims, as well as new case management deadlines.

    b. The Clerk is **DIRECTED** to issue a notice of hearing under separate cover.

**DONE** and **ORDERED** in Fort Myers, Florida on March 22, 2023.

*/s/ Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record